In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 25-1891

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL SAMUEL ETA,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-CR-818-1 — **John Robert Blakey**, *Judge.*

———————————

ARGUED APRIL 8, 2026 — DECIDED JULY 6, 2026

———————————

Before SCUDDER, ST. EVE, and KOLAR, *Circuit Judges.*

ST. EVE, *Circuit Judge*. Daniel Eta was under investigation for leading a transnational cyber fraud scheme when he landed at Hartsfield-Jackson Atlanta International Airport on a flight from Nigeria. As he passed through customs, Customs and Border Protection ("CBP") officers manually searched his three cell phones and found evidence of criminal activity. Eventually, the government charged Eta with wire fraud, computer fraud, and passport fraud.

Eta moved to suppress the fruits of the border search, asserting law enforcement violated his Fourth Amendment rights by scrolling through his phones at the border. After holding an evidentiary hearing, the district court denied Eta's motion. Eta then conditionally pled guilty to one count of wire fraud, reserving the right, which he now exercises, to appeal the district court's order denying his motion to suppress. We affirm.

## I. Background

Unless otherwise noted, we present the facts as the district court found them after holding an evidentiary hearing. The district court's factual findings, which Eta does not question, control unless clearly erroneous. *United States v. Devalois*, 128 F.4th 894, 898 (7th Cir. 2025).

Federal Bureau of Investigation ("FBI") Special Agent Andrew Innocenti was investigating transnational cyber fraud and money laundering schemes when, in May 2016, he conducted a post-arrest interview of Samson Alimi. Alimi informed Special Agent Innocenti that he worked for Daniel Eta on various fraud schemes originating in Nigeria and targeting United States nationals. During the interview, Special Agent Innocenti observed messages from Eta to Alimi containing directions concerning fraud proceeds, corroborating Alimi's allegation.

Over the following year, Special Agent Innocenti obtained information from a confidential source who, like Alimi, alleged that Eta was coordinating fraud schemes that originated in Nigeria. The source also informed Special Agent Innocenti that once Eta and his co-conspirators laundered victims' funds, they sent those funds back to Nigeria through wire

transfers or by purchasing vehicles and shipping them to Nigeria for sale.

Special Agent Innocenti sought to further corroborate the informants' accounts. For one thing, he obtained Eta's bank records, which revealed that Eta had over a million dollars moving in and out of his bank accounts, despite lacking any apparent legitimate source of income. This activity, in Special Agent Innocenti's training and experience, was consistent with his sources' claims. Special Agent Innocenti also testified that he obtained a pen register for Eta's Blackberry Messenger account, as both informants had indicated that Eta used this application to carry out his fraudulent operation. Though the district court did not make a finding on this issue, Special Agent Innocenti offered undisputed testimony—credible testimony, according to the district court—that Eta's Blackberry account had over 1,000 communications per day over a 37-day period. To Special Agent Innocenti, this activity corroborated the informants' descriptions of Eta's modus operandi. Moreover, Eta maintained frequent contact with a suspected (and ultimately indicted) co-conspirator whose bank records showed he received victim funds and then routed a portion of them to Eta.

In December 2017, Special Agent Innocenti learned that, in February, Eta would be returning to the United States from Nigeria. He requested that CBP manually search Eta's electronic devices when he arrived at the border.

CBP Officers Brian Coder and Carlos Carrasquillo managed the encounter with Eta that day, though Special Agent Innocenti and his partner, United States Postal Inspector Natalie Reda, were present for consultation and observation. Officer Carrasquillo interviewed Eta, who provided vague re-

sponses, seemed nervous, stammered, and carried seven pieces of checked luggage, all of which raised flags. Meanwhile, Officer Coder scrolled through Eta's three cell phones as Special Agent Innocenti and Postal Inspector Reda looked on, documenting notable evidence.

Having confirmed that the phones contained evidence of criminal activity, the agents asked the FBI Computer Analysis and Response Team to begin imaging—that is, extracting all data from—Eta's devices. The imaging process took longer than expected, though, so law enforcement decided to seize Eta's cell phones and seek a search warrant for the images. The record is unclear as to precisely how much time elapsed between commencing the manual search and deciding to seize the devices, as well as what portion of that time CBP spent searching Eta's devices. But Special Agent Innocenti's undisputed testimony is that searching Eta's devices, attempting to image them, and ultimately deciding to seize them because imaging was taking too long consumed, all in, "several hours."

Two days later, the government obtained search warrants for Eta's phones, SIM cards, and the images extracted by the FBI. In May 2019, a federal grand jury returned a twenty-seven-count indictment against Eta and his co-conspirators, charging wire fraud, computer fraud, and passport fraud. 18 U.S.C. §§ 1030(b), 1343, 1543.

Eta moved under the Fourth Amendment to suppress all evidence obtained from the warrantless manual search of his cell phones at the Atlanta airport. The district court held an evidentiary hearing at which Special Agent Innocenti, Postal Inspector Reda, Officer Carrasquillo, and Officer Coder testified credibly. The district court then denied Eta's motion, con-

cluding that law enforcement properly manually searched Eta's phones without a warrant under the border search doctrine.

Following the district court's order, Eta pled guilty to one count of wire fraud, conditional on his right to appeal the district court's denial of his motion to suppress. After the district court sentenced him to 109 months' imprisonment, Eta timely appealed.

## II. Discussion

Eta challenges the manual border search of his cell phones as a violation of the Fourth Amendment, a legal question we review de novo. *Devalois*, 128 F.4th at 898.

### A. Border Search Exception

The Fourth Amendment enshrines "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381 (2014) (citation modified). Typically, a search is reasonable only if preauthorized by a judicial warrant. *See id.* at 382. "But not always: The warrant requirement is subject to certain exceptions." *Case v. Montana*, 607 U.S. 107, 113–14 (2026) (quoting *Lange v. California*, 594 U.S. 295, 301 (2021)).

One such exception applies to searches conducted at our nation's borders.[1] The Supreme Court confirmed long ago

---

[1] An international airport's customs area is "the functional equivalent of an international border for the purpose of inspecting persons and articles arriving on international flights." *United States v. Wanjiku*, 919 F.3d

that "searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977).

This principle is older than the Fourth Amendment itself. Before the first Congress proposed what became the Bill of Rights, it authorized customs officials to search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed." Act of July 31, 1789, c. 5, 1 Stat. 29. "Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *Ramsey*, 431 U.S. at 619.

That sweeping language reflects the "qualitatively different" balance of government and privacy interests at the border. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985); *see Riley*, 573 U.S. at 385 ("Absent more precise guidance from the founding era, we generally determine whether to exempt a given type of search from the warrant requirement 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999))). On one side, "the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v.*

---

472, 480 (7th Cir. 2019); *see Almeida–Sanchez v. United States*, 413 U.S. 266, 272–73 (1973).

*Flores-Montano*, 541 U.S. 149, 153 (2004). On the other, "the expectation of privacy [is] less at the border than in the interior." *Montoya de Hernandez*, 473 U.S. at 539. Furthermore, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Id.* at 540.

Precedents from the Supreme Court and our circuit have placed just one limit on border searches, drawing a line between "routine" and "non-routine" searches. "'Routine' searches of people and effects at the border"—like inspecting a bag or opening mail—"are 'per se reasonable' and require no particularized suspicion at all." *United States v. Mendez*, 103 F.4th 1303, 1307 (7th Cir. 2024) (quoting *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002)); *see Montoya de Hernandez*, 473 U.S. at 538 ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or [a] warrant…."). But "highly intrusive, so-called 'non-routine' border searches need … reasonable suspicion." *Mendez*, 103 F.4th at 1307. The Supreme Court has deemed only one search non-routine: "a 16-hour detention for monitored bowel movement of a person suspected of" ingesting balloons filled with narcotics. *Id.*; *see Montoya de Hernandez*, 473 U.S. at 541.

We first applied these principles to a border search of a digital device in *Mendez*, a decision that goes a long way toward resolving this appeal. There, customs agents manually searched the defendant's cell phone and discovered child pornography. *Mendez*, 103 F.4th at 1305. Relying (as Eta does) on *Riley*, in which the Supreme Court held that the search-incident-to-arrest doctrine does not authorize warrantless cell

phone searches, *see* 573 U.S. at 401–02, Mendez argued that the search of his phone required a warrant backed by probable cause, or at least reasonable suspicion.

We rejected both claims. Joining every other circuit to address the issue, we first held "that a border search of a cell phone or other electronic device requires neither a warrant nor probable cause." *Mendez*, 103 F.4th at 1310. We further concluded, again joining "the consensus among circuits," that "brief, manual searches of a traveler's electronic device are 'routine' border searches requiring no individualized suspicion." *Id.*

Eta's primary submission—that border searches of electronic devices require a warrant—runs headlong into *Mendez*. To be sure, we may overturn circuit precedent for "a compelling reason." *United States v. Rivers*, 108 F.4th 973, 979 (7th Cir. 2024). Examples of compelling reasons include "when our position remains a minority one among other circuits, when the Supreme Court issues a decision on an analogous issue that compels us to reconsider our position, or when an intracircuit conflict exists." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (citations omitted).

Eta does not identify a compelling reason to overturn *Mendez*. He instead points only to district court decisions and scholarship adopting the position he supports. We appreciate those perspectives, but they establish only "simple disagreement with a rule [or] the possibility that a rule is debatable," neither of which "constitutes a compelling reason." *Rivers*, 108 F.4th at 979. Indeed, the circuits that have weighed in remain unanimous in declining to adopt a warrant or probable cause requirement for border searches of electronic devices— an unsurprising outcome given the Supreme Court's declara-

tion that "[t]here has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause." *Ramsey*, 431 U.S. at 619; *see, e.g., United States v. Pulido*, 133 F.4th 1256, 1274–75 (11th Cir. 2025); *United States v. Nkongho*, 107 F.4th 373, 381–82 (4th Cir. 2024). We therefore reaffirm *Mendez*.

Anticipating this outcome, Eta offers two independent reasons why, even under *Mendez* and the Supreme Court's unqualified approval of routine border searches, the manual search of his cell phones was unconstitutional: the search was non-routine and lacked reasonable suspicion, or the search lacked a genuine border-related justification.

*Mendez* all but forecloses the claim that CBP's manual search here was not routine. Recall we held "that brief, manual searches of a traveler's electronic device are 'routine' border searches requiring no individualized suspicion." *Mendez*, 103 F.4th at 1310. As we explained, "manual electronic searches at the border are typically 'brief procedure[s]'"—there it was about a half-hour—"practically limited in intrusiveness by the fact that the customs agent cannot download and peruse the phone's entire contents. Instead, they must physically scroll through the device, making it less likely for an agent to tap into the revealing nooks and crannies of the phone's metadata, encrypted files, or deleted contents." *Id.* (alteration in original). These limitations explain why every court of appeals to address manual searches of electronic devices post-*Riley* agrees that they are routine and thus do not require individualized suspicion. *See id.* (collecting cases).

Notwithstanding that the search was manual, Eta urges that its scope (several applications), duration (some portion of several hours), and manner (pre-planned and outside his

presence) establish that it was not routine. In other words, Eta asks that we judge routineness under a multifactor balancing test instead of the bright line rule that every court of appeals to consider the question has adopted.

Eta's request contravenes bedrock Fourth Amendment principles. "[T]he Fourth Amendment," the Supreme Court has explained, "has to be applied on the spur (and in the heat) of the moment, and the object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made." *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001). That is why "[c]ourts attempting to strike a reasonable Fourth Amendment balance … credit the government's side with an essential interest in readily administrable rules." *Id.*

That interest is as strong at the border, which approximately one million people cross daily, as anywhere. *See CBP Releases March 2025 Monthly Update*, U.S. Customs and Border Protection (Apr. 14, 2025), https://www.cbp.gov/news-room/national-media-release/cbp-releases-march-2025-mont hly-update [https://perma.cc/D9GD-7ZPV]. Eta's proposed test, however, insufficiently respects that interest by making it far more difficult for CBP to know when it is crossing the line from "routine" to "non-routine"—and, thus, at what point it needs reasonable suspicion. *Cf. Chatrie v. United States*, 609 U.S. ----, 2026 WL 1855568, at *13 n.9, 16 (June 29, 2026) (highlighting line-drawing and workability concerns). In sum, under *Mendez* CBP conducted a routine search of Eta's devices, so it did not need individualized suspicion.

Eta's argument that the search required a warrant because it lacked a "true border-related justification" also does not

persuade us. On Eta's view, a warrantless border search is permissible only when it is "genuine[ly]" justified by one of (what he asserts are) the purposes underlying the exception: interdicting contraband, enforcing customs laws, and regulating entry. *Mendez*, however, held without qualification that "searches of electronics at the border—like any other border search—do not require a warrant or probable cause." 103 F.4th at 1305. True, *Mendez*'s facts concerned contraband (child pornography), but our holding was not so limited. Noting the sweeping language with which the Supreme Court has approved border searches, we concluded that "[r]outine or otherwise, searches at the border 'never' require a warrant or probable cause." *Id.* at 1307 (quoting *Ramsey*, 431 U.S. at 619).

Indeed, we agreed with the First Circuit's determination that "warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border." *Id.* at 1308 (quoting *Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1st Cir. 2021)). That conclusion echoes the Supreme Court's recognition that "[a]t the border, customs officials" are "charged, along with immigration officials, with protecting this Nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives." *Montoya de Hernandez*, 473 U.S. at 544. In other words, *Mendez* reasoned that border searches of electronic devices—as a category—advance the border search doctrine's purposes. It did not call for case-by-case adjudication of whether a particular search in fact advanced one of those purposes. This is consistent with the unequivocal and unqualified language the Supreme Court has used in upholding the authority to conduct border searches. *E.g.*, *Ramsey*, 431 U.S. at 620 ("It is

[an envelope's] entry into this country from without it that makes a resulting search 'reasonable.'"). It is also analogous to how the Supreme Court has treated searches incident to lawful arrests, which, like routine searches, do not require individualized suspicion. *See Riley*, 573 U.S. at 384, 386 (rejecting "case-by-case adjudication" of "whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest," and instead asking "whether application of the search incident to arrest doctrine to this particular category of effects [i.e., cell phones] would untether the rule from the justifications underlying" it (citation modified)).

Even assuming there is room for such case-by-case adjudication, Eta would not prevail. For one thing, preventing a transnational crime like Eta's furthers the United States's "inherent authority to protect, and … paramount interest in protecting, its territorial integrity," as well as its sovereign "right … to protect itself by stopping and examining persons and property crossing into this country." *Flores-Montano*, 541 U.S. at 152, 153; *see Nkongho*, 107 F.4th at 381 (searches of electronic devices "conducted under the border search exception are critical" because they "may contain evidence of ongoing transnational criminal activity"); *Alasaad*, 988 F.3d at 19.

Moreover, the evidence on which Eta relies to prove that this search lacked a "genuine border-related justification" is meritless. Eta first stresses that the FBI coordinated with CBP in advance. We see no constitutional infirmity in such interagency coordination, however, and other courts of appeals agree. *See United States v. Carter*, 592 F.2d 402, 405–06 (7th Cir. 1979) (participation of Drug Enforcement Agency agent in border search permissible); *see also United States v. Levy*, 803

F.3d 120, 124 (2d Cir. 2015) (concluding there is "no constitutional reason to prevent … federal law enforcement agents from … supplying information to Customs officials in aid of a border search"); *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) ("Courts have routinely rejected the notion that cooperation among federal agencies renders a border search unlawful."); *United States v. Boumelhem*, 339 F.3d 414, 423–24 (6th Cir. 2003).

Eta also emphasizes Officer Carrasquillo's testimony that the purpose of searching Eta's devices was to assist the FBI's investigation. "Because reasonableness is an objective test," however, an officer's "subjective state of mind is irrelevant to a court's Fourth Amendment analysis." *Henry v. Hulett*, 969 F.3d 769, 781 (7th Cir. 2020) (en banc); *see Whren v. United States*, 517 U.S. 806, 813 (1996). Said another way, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States*, 436 U.S. 128, 138 (1978); *see also United States v. Cano*, 934 F.3d 1002, 1016 n.9 (9th Cir. 2019) (rejecting defendant's reliance on officer testimony about purpose of his border search). And here, the objective circumstance justifying a routine search is simple: Eta was at the border. *See Ramsey*, 431 U.S. at 616 ("[S]earches made at the border … are reasonable simply by virtue of the fact that they occur at the border….").

As in *Mendez*, this case does not require us to resolve "whether more intrusive, forensic electronic device searches require individualized suspicion" and, if so, whether such suspicion must be tethered to the purposes underlying the

border search doctrine. 103 F.4th at 1310. We leave those questions for another day.

### B. Good-Faith Exception

Even if Eta prevailed on the Fourth Amendment merits, we would nonetheless affirm because the good-faith exception to the exclusionary rule applies.[2]

The typical remedy for a Fourth Amendment violation is exclusion—the government may not use the unlawfully obtained evidence against the defendant. *United States v. Walker*, 143 F.4th 889, 899 (7th Cir. 2025). Where "officers 'act with an objectively reasonable good-faith belief that their conduct is lawful,'" however, the good-faith exception to the exclusionary rule applies. *Id.* at 900 (quoting *United States v. Rainone*, 816 F.3d 490, 495 (7th Cir. 2016)). In *Davis v. United States*, 564 U.S. 229 (2011), the Supreme Court established one instantiation of the good-faith exception, holding that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id.* at 232.

We have twice applied this principle to border searches of electronic devices. *See generally United States v. Wanjiku*, 919 F.3d 472 (7th Cir. 2019); *United States v. Skaggs*, 25 F.4th 494, 500 (7th Cir. 2022). The upshot of *Wanjiku* and *Skaggs* is straightforward: if CBP reasonably suspected the defendant of criminal activity, the good-faith exception precludes suppression. *See Wanjiku*, 919 F.3d at 479 ("[T]hese agents acted

---

[2] The parties briefed the good-faith exception below, but the district court's order did not address it. We may do so, however, because the parties sufficiently developed the record below. *See United States v. Eymann*, 962 F.3d 273, 288 (7th Cir. 2020).

in good faith when they searched the devices with reasonable suspicion to believe that a crime was being committed, at a time when no court had ever required more than reasonable suspicion for any search at the border."); *Skaggs*, 25 F.4th at 500. Because binding appellate precedent did not change in between the searches conducted in those cases and the search of Eta's phones, *Wanjiku* and *Skaggs* apply with full force here.

"'Reasonable suspicion' is not a high bar." *United States v. Edwards*, 161 F.4th 1088, 1096 (7th Cir. 2025). It requires only "'a particularized and objective basis' for suspecting that [Eta] was engaged in criminal activity." *Wanjiku*, 919 F.3d at 488 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). That standard amounts to "more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021) (quoting *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010)). And it "takes into account 'the totality of the circumstances—the whole picture.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

A pair of additional principles bear on our analysis of this search. First, under the collective-knowledge doctrine, "where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all." *United States v. Eymann*, 962 F.3d 273, 284 (7th Cir. 2020) (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)). In ascertaining whether CBP had reasonable suspicion to search Eta's phones, we may therefore consider knowledge possessed by any of the four law enforcement officers relevant to this case. Second, we have recognized certain additional factors bearing on reasonable suspicion in the border search

context, including "nervous or unusual conduct" and "evasive or contradictory answers." *Yang*, 286 F.3d at 949 (quoting *United States v. Asbury*, 586 F.2d 973, 976–77 (2d Cir. 1978)).

The government reasonably suspected Eta of criminal activity, a conclusion he hardly contests. Law enforcement had two independent sources, one of whom worked for Eta, pin him as the leader of a transnational fraud scheme. Not only did these sources corroborate each other, but independent evidence—Eta's messages on Alimi's phone, Eta's Blackberry Messenger activity, and his bank records—corroborated their claims. *See Alabama v. White*, 496 U.S. 325, 332 (1990) (one "anonymous tip, as corroborated, exhibited sufficient indicia of reliability to" provide reasonable suspicion). At the airport, moreover, Eta provided vague responses, seemed nervous, stammered, and carried seven pieces of checked luggage, which in Officer Carrasquillo's experience raised concerns about potential contraband or unlawful activity. *See Yang*, 286 F.3d at 949. The "cumulative weight" of these facts, *United States v. Yang*, 39 F.4th 893, 901 (7th Cir. 2022), furnished "a particularized and objective basis for suspecting that [Eta] was engaged in criminal activity," *Wanjiku*, 919 F.3d at 488 (citation modified). Under *Wanjiku* and *Skaggs*, then, the good-faith exception would preclude suppression even if Eta could establish a Fourth Amendment violation.

*    *    *

The judgment of the district court is

AFFIRMED.